KETHLEDGE, Circuit Judge,
dissenting.
In construing a contract, the words matter. The words of § 16(d) make clear that it is not merely a “cooperation clause.” To read the provision that way — which is how Abercrombie reads it — is to render nearly half the words of § 16(d) meaningless. Such an interpretation is neither reasonable nor permissible under Ohio law.
Instead, in plain and simple terms, § 16(d) imposes on Abercrombie a separate duty not to prejudice Federal’s position after a claim is filed. Abercrombie breached that duty here. I think we ought to enforce the contract to which Abercrom-bie freely agreed. I would therefore reverse the orders at issue in this appeal.
A.
The chronology in this case is important. In 2004, Federal issued Abercrombie an insurance policy with $10 million in coverage for claims asserted within the policy period. That period expired on September 1, 2005. Abercrombie chose not to renew the policy for the following year, but instead purchased a $10 million policy from a different insurer, AIG. That policy’s coverage began on September 1, 2005. The very next day — by happenstance, apparently — the Ross claims were filed against Abercrombie in federal district court.
It is undisputed that the AIG policy, as originally written, afforded Abercrombie primary coverage for those claims. Predictably, then, Abercrombie reported the claims to AIG. But what happened next was less predictable. On September 29, 2005, Abercrombie elected, under § 12 of the Federal Policy, to purchase ERP coverage from Federal. That election was Abercrombie’s right; and it extended the Federal Policy period to September 30, 2005, thereby encompassing the Ross claims. The election cost Abercrombie $820,000 — twice the cost of the original Federal policy — and seemed merely to afford Abercrombie duplicative coverage for claims already covered under its new policy with AIG. So the election seemed a strange thing to do.
Behind the scenes, however, Abercrom-bie was negotiating with AIG to revise its AIG policy — which again by its terms was primary as to the Ross claims — to be excess as to any claim covered by the now-extended Federal policy. The record makes clear that Abercrombie went to considerable lengths to hide from Federal the fact of those negotiations. Finally, on November 22, 2005 — nearly three months after the AIG policy took effect — Abercrom-bie and AIG executed Endorsements 17 and 18 to the AIG policy. Endorsement 17 retroactively made the AIG policy excess as to a single species of claim: namely, claims made “under this policy and also under Policy No. 8159-6213 issued by Federal Insurance Company.” Those claims, of course, were the Ross claims; and the effect of that change was retroactively to foist on Federal the entire burden of coverage for the claims, up to the $10 million policy limit. Absent that change, Federal and AIG would have shared that burden equally. The endorsement thereby saved AIG up to $5 million. But Abercrombie benefitted from the deal as well: in Endorsements 17 and 18, AIG waived Aber-crombie’s $2 million retention for the Ross claims and promised not to increase Aber-crombie’s premiums for a renewal policy the following year. It appears those changes effectively repaid Abercrombie the cost of its $820,000 ERP election, likely *573 several times over. The cost of all this largesse, of course, fell to the party not in the room — namely, Federal.
B.
Federal says that Abercrombie’s participation in this scheme — the pejorative is earned here — violated § 16(d) of Federal’s policy. That section provides:
The Insureds [ie., Abercrombie] agree to provide the Company [ie., Federal] with all information, assistance and cooperation which the Company may reasonably require and agree that in the event of a Claim the Insureds will do nothing that could prejudice the Company’s position or its potential or actual rights of recovery.
As shown above, the AIG policy took effect on September 1, 2005; the Ross claims were filed on September 2; and Abercrombie made its ERP election on September 29. As of the latter date, then, Federal was obligated to pay only 50% of the costs of the Ross claims, with AIG, per the express terms of its policy, on the hook for other half. Moreover, Abercrombie does not dispute that, had AIG thereafter not borne its share of those costs, Federal could have asserted a contribution claim against AIG for any amounts that Federal paid above 50%. See Buckeye Union Ins. Co. v. State Auto. Mut. Ins. Co., 49 Ohio St.2d 213, 361 N.E.2d 1052, 1055 (1977). That was the status quo on September 29; and at that point it was Abercrombie’s undisputed obligation to “do nothing that could prejudice [Federal’s] position or its potential or actual rights of recovery.” Federal Policy § 16(d) (emphasis added).
But Abercrombie then did something— in the form of Endorsement 17 — that both obligated Federal to pay 100% of the costs of the Ross claims and extinguished Federal’s potential right of recovery against AIG. The effect of that action was to prejudice Federal’s position to the extent of $5 million, which Abercrombie and AIG then spread amongst themselves. That seems to me a patent violation of the terms of § 16(d).
Abercrombie disagrees with that conclusion. In its view, § 16(d) is merely a “cooperation clause”; and, Abercrombie says, “there is considerable legal authority demonstrating that the purposes of cooperation clauses are to prevent collusion between the insured and the claimant” — as opposed, apparently, to collusion between the insured and another insurance company — “and to permit the insurer to participate in the defense and settlement of claims.” Aber. Br. at 28.
The short answer to this argument is that we do not construe contractual provisions in gross. That one provision contains the word “cooperation” does not mean that we treat it as identical to every other contractual provision that contains that word. And it is pointless, therefore, to talk about “cooperation clauses” categorically, without discussing the specific language in each of them. Abercrombie does not mention, much less discuss, a single word of the “cooperation clauses” whose meaning it would graft onto § 16(d) here.
But Abercrombie makes a more serious omission as well. Abercrombie does not explain — anywhere in its brief — what meaning, exactly, it attaches to the language that Federal relies upon in this appeal. The law requires Abercrombie to do so. “In construing a contract,” we “must give meaning to every paragraph, clause, phrase and word, omitting nothing as meaningless, or surplusage[.]” Affiliated FM Ins. Co. v. Owens-Coming Fiberglas Corp., 16 F.3d 684, 686 (6th Cir.1994) (applying Ohio law). Again, § 16(d) provides:
The Insureds [ie., Abercrombie] agree to provide the Company [ie., Federal] *574 with all information, assistance and cooperation which the Company may reasonably require and agree that in the event of a Claim the Insureds will do nothing that could prejudice the Company’s position or its potential or actual rights of recovery.
(Emphasis added.)
The reality is that Abercrombie does not give any meaning to the language italicized above. Rather, it says only that § 16(d) as a whole “can reasonably be interpreted to require the cooperation of Abercrombie in connection with the defense of a Claim, and no more[.]” Aber. Br. at 19 (internal quotation marks omitted). That interpretation is not reasonable, however, because it violates the rule laid down in Owens-Coming. Standing alone, the first part of § 16(d) — “[t]he Insureds agree to provide the Company with all information, assistance and cooperation which the Company may reasonably require” — already requires Abercrombie to cooperate “in connection with the defense of a Claim, and no more.” Abercrombie reads § 16(d) as if it ended there, with a period after “reasoh-ably require.”
But the provision does not end there. It goes on to say “and, [the Insureds] agree that in the event of a Claim the Insureds will do nothing that could prejudice the Company’s position or its potential or actual rights of recovery.” That language describes an obligation, in addition to cooperation, to which Abercrombie freely agreed. The law says that obligation must mean something. Our task is to determine what it is.
Upon examination, the two parts of § 16(d) differ in fundamental respects. The first is a cooperation provision; the second is, for lack of a better term, an anti-prejudice provision. To cooperate is “[t]o work or act together toward a common end or purpose.” The American Heritage Dictionary 414 (3d Ed.). To prejudice is “[t]o affect injuriously or detrimentally by a judgment or an act.” Id. at 1428. Thus one fundamental difference, simply stated, is that the first part of § 16(d) imposes an obligation to help; the second, an obligation not to hurt. The first obligation, moreover, is one to take certain action; the second, an obligation to refrain from certain action. Neither the law, nor good grammar, nor enforcement of the obligations that these sophisticated parties have chosen to assume, allow us to conclude that § 16(d) imposes only the first obligation, “and no more.”
So I submit that § 16(d) imposes on Abercrombie an obligation to “do nothing” to prejudice Federal’s position, and that Abercrombie’s post-claim actions — whose very purpose was to increase Federal’s liability by $5 million and to extinguish its contribution claim for that amount — were in violation of that obligation. And I see nothing in the remainder of § 16(d) to displace that common-sense conclusion. Abercrombie cites the heading of § 16— “Defense and Settlement” — as proof that the prejudice at issue here was not of the sort contemplated by the section. But that argument should go nowhere in a ease where Abercrombie expressly sought, and obtained, an injunction requiring Federal to pay Abercrombie’s defense costs — so far, $8 million of them. Moreover, contrary to Abercrombie’s suggestion, there is nothing in § 16 generally, or § 16(d) specifically, that creates a safe harbor for prejudicial actions taken “with another insurance earner.” There is not a word of text that so limits Abercrombie’s no-prejudice obligation. To the contrary, the text that is there — that Abercrombie shall “do nothing that could prejudice Federal’s position” — could hardly be broader. The same is true of Abercrombie’s obligation to “do nothing” that could prejudice Federal’s “potential or actual rights of recovery.” That obligation extends not just to recov *575 ery against certain parties, but to “potential or actual rights of recovery” — period.
“Plain meaning” is an overused term. I believe, however, that it fairly applies here. Section 16(d)’s no-prejudice obligation is stated in terms that are simple, broad, and common to the law. The parties before us are sophisticated, and they freely agreed to those terms. I submit that we should enforce them.
C.
Abercrombie also presents several arguments external to § 16(d). The first is that two other sections of the Federal Policy — §§ 12 and 18 — demonstrate that § 16(d) could not bar the scheme at issue here. Section 12 of the Policy affords Abercrombie a 30-day window to elect ERP coverage. And there is no disputing that Abercrombie’s ERP election — which came after filing of the Ross claims— changed Federal’s position for the worse. Thus, Abercrombie says, § 16(d)’s injunction to “do nothing” cannot mean what it says, which means in turn (and here the argument fails even on its own terms) that Endorsement 17 was permissible. Section 18, for its part, does not grant rights to Abercrombie at all, but instead diminishes them, by limiting the instances in which Federal’s coverage is primary. But § 18 does implicitly contemplate that Aber-crombie might have additional coverage for a particular claim. So Abercrombie says that section too shows that Endorsement 17 was fair game.
Abercrombie’s contention as to § 12 is scythed down by an elementary rule. The existence of this rule, and that it applies here, are points on which the majority and I agree. “[A] contract’s specific provisions, such as § 12 of the Federal Policy, control over a more general provision such as § 16.” Maj. Op. at 571 (citing Monster v. Cincinnati Cas. Co., 74 Ohio App.3d 321, 598 N.E.2d 1203, 1209 (1991)). The rule’s effect is to harmonize provisions that at first seem to conflict, rather than having one of them cancel the other out.
When we harmonize the two provisions here, § 16(d) remains a bar to conduct like Endorsement 17. I completely agree with the majority that § 12 is more specific than § 16(d) as to whether Abercrombie was free to extend its coverage within the 30-day ERP window, and that § 12 therefore controls that issue. But that only means that Abercrombie’s ERP election was legal, not that Endorsement 17 was. That § 12 prescribes a highly specific right to elect ERP coverage, to which § 16(d) must yield, does not mean that § 16(d)’s “do nothing” language itself means nothing at all. That, in truth, is what Abercrombie intimates here. But the law is otherwise: Subject only to the right to elect ERP coverage, Abercrombie’s no-prejudice obligation remains enforceable, to the full extent of its plain, broad terms, except to the extent it conflicts with some other provision that more specifically governs conduct like Endorsement 17.
There is no such provision. Abercrom-bie cites § 18, but that section — -apart from being one that grants rights to Federal, not Abercrombie — contemplates decisions by Abercrombie as to how to layer its coverage only before a claim is filed. Section 18 provides in relevant part:
If any Loss under this coverage section is insured under any other valid insurance policy(ies), then this coverage section shall cover such Loss, subject to its limitations, conditions, provisions and other terms, only to the extent that the amount of such Loss is in excess of the applicable retention (or deductible) and limit of liability under such other insurance, whether such other insurance is stated to be primary, contributory, excess, contingent, or otherwise])]
*576 This section confirms rather than refutes Federal’s interpretation of § 16(d). Section 18 says that, if another company’s policy provides coverage for a claim that is also covered by Federal’s policy, the Federal coverage is excess (rather than primary) unless the other policy is by its terms exclusively excess. This provision would be an exercise in stultification, however, if the insured could amend the other policy to be exclusively excess after a claim is filed. That, of course, is what Aber-crombie did in executing Endorsement 17.
Section 18 thus implies only that Aber-crombie can structure its other insurance before a claim is filed. It has nothing to imply about afterwards. To read § 18 as Abercrombie does — as affirmatively, if implicitly, authorizing conduct that makes § 18 itself unenforceable — is beyond ironic. It is to interpret § 18 as meaningless, as a provision without effect, except to the extent § 18 renders § 16(d) meaningless as well. The law does not permit that interpretation.
Only two arguments of significance remain. First, that Abercrombie paid a lot of money to obtain ERP coverage does not mean it was entitled to do what it did here. As an initial matter, this argument requires a certain suspension of disbelief, since Endorsement 17 effectively repaid Abercrombie its money several times over. But even if one disregards that reality: What Abercrombie bought, under § 12, was a right of adverse selection — the right to obtain coverage from Federal after a claim is filed against Abercrombie, rather than before. That right is valuable, and was priced accordingly. What Abercrom-bie did not buy, however, was a right of post-claim collusion. Section 16(d) says that right was not for sale.
Second, the rule that ambiguities are resolved against the insurer does not apply here. That § 16(d)’s terms are broad, does not mean they are ambiguous. See Nationwide Mut. Fire Ins. Co. v. Wittekind, 134 Ohio App.3d 285, 730 N.E.2d 1054, 1058 (1999) (“a term is not ambiguous simply because it includes a wide variety of objects or concepts in its definition”). And that a contract is complicated, does not mean it is unclear. See Value City, Inc. v. Integrity Ins. Co., 30 Ohio App.3d 274, 508 N.E.2d 184, 189 (1986) (“[a] contract is not ambiguous merely because it is complex or difficult to read as a whole”). I think the terms of the parties’ agreement, when examined closely, provide a clear answer to the question presented here.
It is with no small irony, moreover, that Abercrombie cites the rule that ambiguities should be resolved against the insurer. The policies behind that rule, presumably, include the relative bargaining power and sophistication of insurer and insured. It is hard to imagine a case in which those policies are less apposite than they are here. If there was a wolf in this story, it was not Federal.
* * *
Although I write alone, I think it fair to say that the majority’s decision does not lend to this scheme the imprimatur of this court. What is legal is sometimes different from what is right. Today Abercrombie is the beneficiary of that distinction.
I respectfully dissent.